IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Anthony M. Washington,      ) | |
| ) | |
| Plaintiff,      ) | **ORDER GRANTING DEFENDANTS'** |
| ) | **MOTIONS FOR SUMMARY** |
| vs.      ) | **JUDGMENT** |
| ) | |
| Reliance Telephone Systems and      ) | |
| McLean County,      ) | Case No. 1:19-cv-124 |
| ) | |
| Defendants.      ) | |

Before the court is a Motion for Partial Summary Judgment filed by Defendant McLean County. (Doc. No. 44). Also before the court is a Motion for Summary Judgment filed by Defendant Reliance Telephone Systems ("Reliance"). (Doc. No. 53). For the reasons that follow, both motions are granted.

I.      **BACKGROUND**

Plaintiff Anthony M. Washington ("Washington") was a pretrial detainee at the McLean County Jail (hereafter referred to as the "Jail") in Washburn, North Dakota, when he initiated the above-captioned action pro se and in forma pauperis. Since initiating this action he has been convicted of two Class A misdemeanors and served the sentence imposed by the state district court. He now resides in Detroit, Michigan.

Washington had one claim against McLean County and Reliance that survived initial review, the gist of which is that he was denied the ability to privately communicate with counsel while in custody in violation of his constitutional rights.

On March 15, 2021, McLean County filed a motion for summary judgment. That same day Reliance filed a motion for partial summary judgment. Both motions have now been fully briefed

1

and are ripe for the court's consideration.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. Davison v. City of Minneapolis, 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party. Id. The purpose of summary judgment is to assess the evidence and determine if a trial is genuinely necessary. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law. Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005). The moving party bears the responsibility of informing the court of the basis for the motion and identifying the portions of the record which demonstrate the absence of a genuine issue of material fact. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011). The non-moving party may not rely merely on allegations or denials in its own pleading; rather, its response must set out specific facts showing a genuine issue for trial. Id.; Fed. R. Civ. P. 56(c)(1). If the record taken as a whole and viewed in a light most favorable to the non-moving party could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial and summary judgment is appropriate. Matsushita, 475 U.S. at 587.

### III.   DISCUSSION

####   A.   Underlying Facts

The following facts are either undisputed or are presumed to be true for the purposes of this order.

Washington was charged in McLean County by way of an Information with two Class C felonies, a Class A misdemeanor, and a Class B misdemeanor. (Doc. Nos. 46-11, 46-12). He was arrested in Michigan and extradited to North Dakota. (Doc. No. 46-10). He arrived in North Dakota and was booked into the Jail on May 18, 2019. (Doc. No. 46-10). He was first represented by attorney Paul Merkins and, when Mr. Merkins was granted leave to withdraw, by attorney Steven Balaban. (Doc. Nos. 46-11 through 46-19). Pursuant to an agreement he reached with the prosecution, he entered guilty pleas on October 2, 2022, to two Class A misdemeanors and was sentenced by the state district court to 360 days incarceration, with 156 days credit for time served. (Doc. No. 46-20, 47). He served his sentence at the Jail. He was discharged from the Jail on or about February 29, 2022.

Washington learned within months of being booked into the Jail that several of his telephone calls to counsel had been recorded. He initiated that above-entitled action pro se and in forma pauperis on June 20, 2019. (Doc. Nos. 1 through 6). He alleged that Jail staff had intentionally monitored, listened in on, and otherwise recorded several of his telephone calls with counsel. (Doc. No. 6). He further alleges that the recordings of these calls and/or the information gleaned from these calls by staff were passed to the prosecution for use against him in his criminal case. (Id.). The prosecuting State's Attorney has attested that he neither has any information or used any information from Washington's attorney calls against him or to gain an unfair advantage in his

criminal case. (Doc. No. 47). Jail staff who had contact with Washington while in custody have also attested that they did not direct the recording of or otherwise listen in on Washington's attorney calls and did not otherwise conspire with or provide information to the prosecutors in Washington's criminal case. (Doc. Nos. 48 through 52).

The Jail has a "custody manual" that provides the following with respect to inmate telephone calls:

> 502.8 INMATE TELEPHONE CALLS
> Every inmate detained in this facility shall be entitled to at least one completed telephone call upon being admitted and no later than three hours after arrest. The calls may be of a duration that reasonably allows the inmate to make necessary arrangements for matters that he/she may be unable to complete as a result of being arrested. The calls are not intended to be lengthy conversations and the custody staff may use their judgment in determining the reasonable duration of the calls. If it is determined that the person is a custodial parent with responsibility for a minor child, the person shall be entitled to make such additional telephone calls as reasonably necessary for the purpose of arranging care for the minor child.
>
> There is no obligation for the custody staff to make a telephone call on an inmate's behalf, for example in the case of a person who is so intoxicated that he/she cannot make a call. The custody staff is not required to wake an intoxicated person so that the person may complete a call. An intoxicated person should be provided the opportunity to make the telephone calls once the person awakes.
>
> 502.8.1 TELEPHONE CALL PROCEDURES
> The Office will pay the cost of local calls. Long distance calls will be paid by the inmate, using calling cards or by calling collect.
>
> <u>Calls between the inmate and his/her attorney shall be deemed confidential and shall not be monitored, eavesdropped upon or recorded</u>.
>
> 502.8.2 ONGOING TELEPHONE ACCESS
> Ongoing telephone access for inmates who are housed at this facility will be in accordance with the Inmate Telephone Access Policy.

(Doc. No. 46-6) (emphasis added).

The Jail also has an inmate handbook to which Washington had continuous access while he

was incarcerated. (Doc. Nos. 7, 8, 46-5 at pp. 61-62, and 48). There were at least two versions of the handbook, the first dated March 1, 2016, and the second dated November 1, 2019, that were in circulation during the pendency of Washington's incarceration at the Jail. (Doc. Nos. 7, 8, 46-35 at p. 16, 48). Both versions provided the following with respect to telephone calls by detainees:

> You are allowed one (1) initial call upon admission at County Expense. The initial call will not be given until booking process and fingerprinting is completed. Inmates housed for agencies under contract do not receive the initial telephone call. All other calls you make are at your own expense. Personal phone calls may be made & received from 7:00 a.m. to 10:00 p.m. daily on the phones located in or near your cell area. Directions on how to use the phone is posted in your cell area. You may purchase phone cards from the McLean County Jail from the Turnkey Kiosk. There is not a refund for lost cards or for time left on the card when you leave. <u>All calls are recorded and may be monitored</u>. You may check for incoming calls by dialing the first three (3) letters of your last name. Voice messages are only saved for three (3) days. All calls made to health care providers, clergy, human services, attorneys and bondsman will have priority over personal calls and you may make or receive these calls at any time. If you are indigent, you will be allowed (1) personal calls per week, which will be approved by the Jail Administrator. All long distance calls you make will be at your own expense. You may use a calling card or it must be made COLLECT. This includes calls made to health care providers, clergy, human services, attorneys and bondsman. You are allowed 3 minutes per call for personal calls. Keep in mind the Correction Officers have other duties and personal phone calls are secondary to security duties. <u>All calls are recorded and possibly monitored. If your call is to an attorney and you do not want the call recorded, you have to request the call be made on a non-recorded line. All other calls requested on a non-recorded line will be at officer's discretion</u>.

(Doc. Nos. 7 at p. 5, 8 at p. 5) (emphasis added). Hard copies of the handbook were placed in the Jail's dorm areas. (Doc. No. 46-35 at pp. 61-62). A digital copy of the handbook was also loaded onto a kiosk that the Jail's inmates could access. (<u>Id.</u> at p. 16).

The record reflects that Washington was able to review the handbook and familiarize himself with its contents. First, a printout from the aforementioned kiosk confirms that Washington read the handbook by May 29, 2019, at 5:59 AM. (Doc. No. 46-4). Second, Washington testified at his deposition that there was a copy of the handbook in the dorm area that no one used but him. (Doc.

5

Nos. 46-5, pp. 61-62).

The record also reflects that Washington was aware of his right to private conversations with counsel and what the Jail required of him to arrange for such conversations. Again, he had access to and was familiar with the handbook. Additionally, at his deposition, he acknowledged that he had been reacquainted with his right to private conversations with counsel when booked into the Jail and was aware that he would have to make arrangements with Jail staff to use the telephone in the visitation booth in order to privately converse with counsel.

> Q. So, were you on notice, on the first day of your booking, that you could have confidential communications with your attorney if you specifically requested them?
>
> A. Yes.
>
> Q. So, your claim here is that -- it seems to me that you weren't aware that your calls were being recorded.
>
> A. No.
>
> Q. Maybe you had been given some indication that your calls were going to be recorded, unless you requested otherwise; is that correct?
>
> A. Okay, yes. So, this right here is not for the jail. The paper that you read, this is what you sign when you are going to bond hearing. You have to go to ITV court, which is like a Zoom court. So, this is for Zoom court and me talking to my client in Zoom court without the court reporter lady, you know, the people that's there. Because it's Zoom court. ITV is like this, but it's for bond hearings. So, this is referring to bond hearings. This is not referring to the running of the jail. This is what I had to sign when they made my bond. When they made my bond 10,000 cash only for a misdemeanor. So, this is what this was for, the ITV. This has nothing to do with Reliance. This has nothing to do with McLean County jail. The reason why it says McLean County Jail Courthouse and Burleigh Courthouse, is because the judges from from Burleigh Courthouse. McLean doesn't have any judges. They all -- but they have a big case load. So, by them having a big case load, and low judges, they recoup their judges from Bismarck. So, the judges come from the Bismarck area. Go to their chambers. Use ITV. Knock down the population because they doing court from T.V. versus transporting them next

> door for dispositions and preliminary exams and things.

Q. So, your court appearances -- during your court appearances, you were located at the McLean County jail; is that correct?

A. Yes.

Q. And so, regardless of whether there is a court document or a McLean County document or a Reliance document, it does put you on notice that you have the right to request that your attorney-client communications are not recorded, correct?

A. Yes. I've done that numerous times. That's how we have the five calls without all the calls being processed with him. Those were all requests, or he called in. They don't even have -- all of it is not even accurate. Because they only have when he picked up.· There was plenty of times, when I called, that he didn't pick up. None of those are registered. They only showing when he called me. They are not showing when I called him.

Q. Sure. That makes sense. So, that list of calls that you had to use kind of a different phone booth to make?

A. Yes.

Q. You were aware that you could do that because this document let you know that you could make private attorney-client calls, correct?

A. Right.· I was aware that I can -- well, from being in prison before, I knew that you have to ask for attorney-client privileges unless they say that you don't....

\* \* \*

Q. So, you knew about this separate phone system that you could use to call your attorneys if you wanted to communicate privately because you've before in other settings like this in the past?

A. Yes, right.

Q. So, you knew to ask for it?· And you knew that was an option for you, correct?

A. Yes. They didn't even have to state it, because I know it's procedure and protocol. That's why I asked....

(Doc. No. 46-35 at pp. 141-145). Third he had ongoing access or the ability to access the inmate handbook.

Inmates can make calls from telephones located in the Jail's dorm areas. (Doc. No. 46-35 at pp. 36-37). These telephones are connected to a card-based system or service installed and maintained by Reliance. From these telephones inmates can call collect or via a prepaid calling card purchased through Reliance from a kiosk. (Doc. Nos. 48). Posted near these telephones were placards that (1) instructed inmates on how to use the phone system, (2) listed the costs/rates for using the phone system, and (3) advised inmates that their calls "may be recorded or monitored." (Doc. No. 46-5). At the beginning of collect calls, an automated message advised inmates their conversations may be subject to monitoring and recording. (Doc. No. 48).

Inmates could also make calls using a telephone in the visitation booth. This telephone was not tied directly into Reliance's system and therefore was not subject to the same monitoring and recording as telephones in the dorm areas. (Id.). It appears from the record that Washington appreciated that this was the telephone which he could make private calls and that he would have to make the necessary arrangements with Jail staff in order to use/access it.

> Q. So, here [referring to Exhibit 10] it says you may have confidential communications with your defense attorney if they're requested. Does that sound right?
>
> A. Yes.
>
> Q. So, were you on notice, on the first day of your booking, that you could have confidential communications with your attorney if you specifically requested them?
>
> A. Yes.

* * *

Q. You were aware that you do that because this document let you know that you could make private attorney-client calls, correct?

A. Right. I was aware that I can – well, from being in prison before, I knew that you have to ask for attorney client privileges unless they say that you don't.

\* \* \*

Q: So, your court appearances,–during your court appearances, you were located at the McLean county Jail; is that correct.

A: Yes.

Q: And so, regardless of whether there is a court document or a McLean County document or a Reliance document, it does put you on notice that you have the right to request that your attorney-client communications are not recorded, correct?

A: Yes. I've done that numerous times. That's how we have the five calls without the calls being processed with him. Those were all requests, or he called in . They don't even have – all of it is not even accurate. Because they only have when he picked up. There was plenty of times, when I called, that he didn't pick up. None of these are registered. They only showing me when he called. They are not showing when I called him.

Q: Sure. That makes sense. So. That list of calls that you had to use kind of a different phone booth to make?

A: Yes.

Q: You were aware that you could do that because this document let you know that you could make private attorney-client calls, correct?

A: Right. I was aware that I can – well, from being in prison before, I knew that you have to ask for attorney-client privileges unless they say that you don't.

\*\*\*

Q: So, you knew about this separate phone system that you could use to call your attorneys if you wanted to communicate privately because you'd be before in the other settings like this in the past?

A: Yes, right.

> Q: So, you knew to ask for it? And you know that was an option for you, correct?
>
> A: Yes. This didn't even have to state it, because I know it's procedure and protocol. That's why I asked.

(Doc. No. 46-35 at pp. 36-37). The Jail kept a record of who inmates call from this telephone and when. They did not record the substance of these calls, however. (Doc. Nos. 46-9, 46-22, 46-23, and 48-52).

**B.   Analysis**

    **1.   <u>Monell liability</u>**

"Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." <u>Albright v. Oliver</u>, 510 U.S. 266, 271 (1994) (internal quotation marks omitted). To state a claim for relief under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law. 42 U.S.C. § 1983; <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988).

"A governmental entity cannot be held vicariously liable for its agent's acts under § 1983." <u>Brockington v. City of Sherwood</u>, 503 F.3d 667, 674 (8th Cir. 2007). It may be held liable under Section 1983 only if its policy or custom caused the deprivation of the right protected by the constitution or federal law. See <u>Angarita v. St. Louis Cnty.</u>, 981 F.2d 1537, 1546 (8th Cir. 1992) (citing <u>Monell v. Department of Social Services</u>, 436 U.S. 658, 690–91 (1978)); <u>see</u> <u>also</u> <u>Ware v. Jackson Cnty., Mo.</u>, 150 F.3d 873, 880 (8th Cir. 1998) ("A plaintiff may establish municipal liability under § 1983 by proving that his or her constitutional rights were violated by an action pursuant to official municipal policy or misconduct so pervasive among non-policymaking employees of the

municipality as to constitute a custom or usage with the force of law." (internal quotation marks omitted)).

"Official policy involves 'a deliberate choice to follow a course of action made from among various alternatives' by an official who is determined by state law to have the final authority to establish governmental policy." Ware v. Jackson Cty., 150 F.3d 873, 880 (8th Cir. 1998) (quoting Jane Doe A v. Special Sch. Dist. of St. Louis Cty., 901 F.2d 642, 645 (8th Cir 1990)). Alternatively, "custom or usage" is demonstrated by:

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
>
> (3) The plaintiff's injury by acts pursuant to the governmental entity's custom, i.e., proof that the custom was the moving force behind the constitutional violation.

Ware, 150 F.3d at 880 (quotation omitted).

"A failure to properly train employees is one way in which an entity can exhibit deliberate indifference toward the rights of others." Harvey v. Cnty. of Ward, 352 F. Supp. 2d 1003, 1012 (D.N.D. 2005) (quoting Turney v. Waterbury, 375 F.3d 756, 762 (8th Cir. 2004)). "Only where a [governmental entity's] failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a ... 'policy or custom' that is actionable under § 1983." Id. (alterations in original) (quoting City of Canton v. Harris, 489 U.S. 378, 389 (1989)). "A plaintiff may also be able to show a governmental entity was deliberately indifferent by establishing 'that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so

11

likely to result in the violation of constitutional rights, that the policy makers of the [county] can reasonably be said to have been deliberately indifferent to the need.'" Id. (alternations in original) (quoting Andrews v. Fowler, 98 F.3d 1069, 1076 (8th Cir.1996)).

Here, Washington does not dispute that the Jail has written telephone policies and procedures that are memorialized in the Sheriff's Manual. Rather, he appears to take the position that in practice, there is not strict adherence to these policies and procedures and that it is customary at the Jail to record calls or otherwise listen in on calls without regard to who the inmate was calling or from which telephone the inmate was making the call.

> Q. So Anthony, let's look at Exhibit Number 6. This is a page out of the McLean County sheriff's office custody manual. Which are the policies and procedures at the jail. And about the middle of the page it says 502.8.1, telephone call procedures; do you see that?
>
> A. Yes.
>
> Q. Can you read what is says under that sentence, a few sentences.
>
> A. Which section?
>
> Q. 502.8.1
>
> A. The office will pay the cost of local calls. Long distance calls will be paid by the inmate using calling cards or by calling collect. Calls between the inmate and his attorney shall be deemed confidential and shall not be monitored eavesdropped or recorded.
>
> Q. So, I'm telling you that was the official policy of the McLean County jail when you were an inmate there during the entire time period. Do you have anything that suggests that was not the policy?
>
> A. No. They don't even let you see this. We never got this. We get inmate handbooks. We was never able to see this. Even though it is true. They are deemed confidential and shall not be monitored, eavesdropped on, or recorded. But the thing is, how can they differentiate between the two when there is no system in place to even differentiate between the two. So, how can you tell me that you're not listening to my attorney phone call when you don't know if I made an attorney phone call

>because the way that I'm on – all my phone calls are long distance. So the way that I communicate is putting in a calling card, which says it goes straight through.

(Doc. No. 46-35 at p. 20).

There is is no dispute that several of Washington's calls with counsel were recorded. However, there is no evidence in the record to support the assertion that the Jail or Reliance had a policy or custom of purposely or intentionally recording attorney-client calls.

It is apparent from the record that Washington's calls to counsel were not recorded or otherwise monitored because of any standing directive or practice of recording such calls. Rather, these calls were recorded because they were made from telephones in the dorm areas that are connected to Reliance's system. Staff would have no way of knowing ahead of time who inmates intended to call from these telephones. Inmates were or should have been aware that calls placed from these telephones were monitored and/or recorded; they were so warned in the inmate handbook, by staff, by the placards near these telephones, and by the automated messages that played on these telephones when placing a collect call. The Jail had another telephone in the visitation booth that was not connected to Reliance's system and from which inmates could place confidential calls to counsel.

To safeguard against recording against attorney-client communications, the Jail had a procedure in place. This procedure was memorialized in the inmate handbook that Washington has acknowledged that he was intimately familiar with. If he wanted to call his attorney and he did not want to have the call recorded, he would have to request the call be made on a non-recorded line, which was generally understood to be a telephone in the visitation booth.

The only calls of Washington's that were recorded were those he placed form the telephones in the dorm areas. The calls to counsel that Washington made from the visitation booth were not

recorded.  This belies Washington's assertion that it was  policy or custom to record inmates telephone calls with counsel.  Conversely, it bolster's the Jail's assertion that Washington was aware of its policy regarding calls to counsel and had access to private line.

Washington is critical of the fact the visitation booth and its telephone were not always available at his convenience and that he had to make arrangements with Jail staff to use it.  He also supposes that, while calls made from the visitor  booth telephone were not recorded, they were still subject to monitoring by staff.  His "evidence" of this is that the prosecution was always one step ahead of him as he has acknowledged that he never directly observed anyone listening in on his conversations.

First, the fact that Washington was required to make arrangements with staff to use the telephone in the visitation booth and that, due to institutional demands, staff may not have been immediately able to accommodate his requests (and required him to wait to use the telephone)  is not evidence of a policy or custom of monitoring attorney-client calls.  If anything, it is a reflection of the balancing act that staff had to undertake when attending to the needs and wants of other inmates in accordance with the Jail's policies. Washington acknowledged as much in his deposition when he observed that the Jail had only four staff members at any given time to attend to the demands of thirty inmates. (Doc. No. 46-35 at p. 18).  Any inadequacies in the implementation of the Jail's policies regarding the visitation booth do not rise to the level of a showing of a deliberate choice to follow a course of action and therefore do not constitute an unconstitutional policy or custom.  Andersen v. Cnty. of Becker, No. CIV 08-5687 ADM RLE, 2009 WL 3164769, at *8 (D. Minn. Sept. 28, 2009).

Second, supposition and suspicion, without more, is not enough to create a material issue of

14

fact and therefore avoid summary judgment. Washington's perception that the prosecution was always one step ahead of him is not evidence of any nefarious activity undertaken by the prosecutor or the Jail staff. As for the Jail's requirement that inmates be proactive and take an affirmative step in safeguarding the privacy of their communication with counsel, it is not tantamount to a policy or custom of monitoring calls with counsel or otherwise steering inmates from the telephone in the visitor's booth to telephones in the dorm areas that were subject to monitoring. It is also not demonstrative of indifference, deliberate or otherwise.

In his deposition Washington fixated on the prerecorded message that played when making a collect call as opposed to a paid call from telephones in the dorm areas. Apparently collect calls placed from the telephones in the dorm areas featured the automated warning regarding monitoring whereas prepaid calls did not. By Washington's account, he made the majority of his calls using prepaid calling cards and so was not warned that his calls could be subject to monitoring.

> A. . . . . The ones in the dorm were more intimate than the ones in the booth. Because I had more dorm because they wouldn't give me the attorney in the booth because they were so busy. It was in intimate jail. So, if there's only four staff members and there's thirty inmates, they're outweighed. So I used – most of my phone calls were in the dorm instead of – it was on a Reliance phone call versus being on a jail phone call.

(Doc. No. 46-35 at p. 18).

Washington's attempt to differentiate collect calls from prepaid calls makes no substantive difference in the final analysis. The important takeaway here is the calls were made from the telephones in the dorm areas, which means that they were connected to Reliance's system and therefore known to be monitored. Regardless of whether or not an automated warning played at the outset of prepaid calls, there were still the warning on the placards nears these telephones, the warning in the inmate handbook, and the information provided to Washington at the time of his

15

booking regarding the Jail's telephone policies and procures.

Washington was aware that he would have to make arrangements with Jail staff to use the telephone in the visitation booth if he wanted to ensure that his conversation with counsel was not recorded. He was also on notice that calls made from telephones in the dorm areas could be recorded and yet made the conscious choice to use them when calling counsel.

> Q. So, you knew about this separate phone system that you could use to call your attorneys if you wanted to communicate privately because you've been in other settings like this in the past?
>
> A. Yes, right.
>
> Q. So, you knew to ask for it? And you knew that was an option for you, correct?
>
> A. Yes. They didn't even have to state it, because I know it's procedure and protocol. That's why I asked....

(Doc. No. 46-35 at p. 37).

In sum, the record is devoid of any evidence of an unconstitutional policy at the Jail. The record is also devoid of any "widespread, persistent pattern of unconstitutional misconduct by government that government policy makers either were indifferent to or tacitly authorized." Andersen v. Cnty. of Becker, No. CIV 08-5687 ADM RLE, 2009 WL 3164769, at *9 (D. Minn. Sept. 28, 2009). Conversely, there is evidence–affidavits from staff members who had contact with Washington–that no efforts were undertaken by staff to purposely record Washington's attorney-client communications, that staff did not eavesdrop on Washington's attorney-client communications, and that staff did not provide information or assistance to those prosecuting Washington's criminal case. (Doc. Nos. 48-52). As a consequence, Washington has not met the requirements of Monell. His claim therefore does not survive summary judgment.

### 2. Fifth and Sixth Amendment

Even if Washington could satisfy the requirements of Monell, his claims nonetheless fail. Insofar as Washington claims that information obtained from his recorded or monitored calls was used against him, the record is devoid of any substantiating evidence. As noted above, Washington has presented nothing but suspicion and supposition where McLean County has provided affidavits from both the prosecutor and jail staff in which they attest that no information gleaned from these claims was circulated, much less used.

Insofar as Washington may be claiming that the recording or monitoring of his calls violated his Sixth Amendment right to counsel, he has failed to demonstrate that he suffered any prejudice. To raise a successful § 1983 claim for the violation of the Sixth Amendment, Washington must demonstrate that there was an intrusion into the attorney-client communication and that he was prejudiced as a result. Weatherford v. Bursey, 429 U.S. 545, 558 (1977). Here, there is no evidence that the prosecution ever listened to or otherwise used the recording of Washington's conversations with counsel. Moreover, it is apparent from the record that Washington did use the means at his disposal to safeguard his communications with counsel. He repeatedly chose to call his attorneys on lines he knew were monitored instead of making the arrangements necessary with staff to use the private line available for such communications.

### IV. CONCLUSION

Several of Washington's attorney-client calls were recorded. However, there is nothing in the record to suggest that they were recorded by the Jail and Reliance due to any policy, formal or informal, or custom. The Jail had safeguards in place for ensuring that inmates could privately converse with counsel. Washington, perhaps due to convenience, impatience, or indifference, did

not avail himself of these safeguards through no apparent fault of the Jail staff or Reliance and chose to call his attorney from telephones he knew were monitored. Accordingly, McLean County's Motion for Partial Summary Judgment (Doc No. 44) and Reliance's Motion for Summary Judgment (Doc. No. 53) are **GRANTED**.

Dated this 2nd day of December, 2022.

<u>/s/ Clare R. Hochhalter</u>
Clare R. Hochhalter, Magistrate Judge
United States District Court